## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Civil Action No.:

REUVEN HERSSEIN, Individually and On Behalf
of All Others Similarly Situated,

        Plaintiff,

                                   **JURY TRIAL DEMANDED**

v.

BANK OF AMERICA CORPORATION, a Delaware
corporation, VISA USA, INC., a Delaware
corporation,

        Defendants.

_____/

### CLASS ACTION COMPLAINT

Plaintiff, REUVEN HERSSEIN, individually, and on behalf of all others similarly situated ("Plaintiffs"), by and through undersigned counsel, hereby sue and make the following allegations against Defendants BANK OF AMERICA CORPORATION, a Delaware corporation ("BOA") and VISA USA, INC., a Delaware corporation ("VISA") (collectively "Defendants"). In support thereof, Plaintiff states as follows:

Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this class action individually and on behalf of all other persons in the United States who, upon purchasing a cryptocurrency from Coinbase.com or any other money transmitter, incurred "foreign transaction" fees on consumer credit cards issued by Defendant Bank of America, N.A. and Defendant VISA USA, Inc. Plaintiff makes the following allegations based on the investigation of his counsel, and based upon personal knowledge as to himself and his own acts and dealings with the Defendants.

Plaintiff and his counsel believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION
### History of Cryptocurrency Development

1.     In recent years, so-called "cryptocurrencies" such as Bitcoin, Litecoin, and Ethereum have gained public attention for their potential technological applications to the future of business and finance. Many consumers view cryptocurrencies as a technology that could eventually help replace conventional, government-issued money. As of today, however, cryptocurrencies are not money at all; they are a technology, mere computer programs stored on computers around the world. Cryptocurrencies are not created or issued by the U.S. government or any other government. They are not issued or created by any regulated financial institution, nor are they recognized as legal tender in any foreign or domestic jurisdiction.

2.     At is core, cryptocurrency is simply a giant ledger that tracks the ownership and transfer of every "coin" in existence.  This is called blockchain technology.

3.     Blockchain could be regarded as a public ledger and all committed transactions are stored in a list of blocks. This chain grows as new blocks are appended to it continuously. Asymmetric cryptography and distributed consensus algorithms have been implemented for user security and ledger consistency. The blockchain technology generally has key characteristics of decentralization, persistency, anonymity and auditability. With these traits, blockchain can greatly save the cost and improve the efficiency.

4.     Since it allows payment to be finished without any bank or any intermediary, blockchain can be used in various financial services such as digital assets, remittance and online

payment. Additionally, it can also be applied into other fields including smart contracts, public services, Internet of Things (IoT), reputation systems, and security services.

5.    Those fields favor blockchain in multiple ways. First of all,blockchain is immutable. Transaction cannot be tampered once it is packed into the blockchain. Businesses that require high reliability and honesty can use blockchain to attract customers. Besides, blockchain is distributed and can avoid the single point of failure situation. As for smart contracts, the contract could be executed by miners automatically once the contract has been deployed on the blockchain.

## Cryptocurrency Mining

6.    Many consumers have come to view cryptocurrencies as the future of money, or at the very least, the future of financial technology. For that reason, some consumers have come to ascribe tremendous economic value to owning cryptocurrency. When and if cryptocurrencies become money in the conventional sense, some consumers want to be found owning them, largely because cryptocurrencies differ from conventional currency in one important respect. Every type of cryptocurrency is programmed to be finite in number and ultimately fixed in supply.

7.    Bitcoin, the first ever cryptocurrency, was released as open-source software in 2009 by an anonymous person, or group of persons, under the pseudonym "Satoshi Nakamoto." Since 2009, several other cryptocurrencies have been invented by various tech experts seeking to improve upon and/or offer alternatives to the Bitcoin concept. Some of the more popular cryptocurrencies available for public purchase include Litecoin, Ethereum, and Ripple. All have grown in notoriety and value over the last several years, as the

concept of cryptocurrencies has spread from a fringe group of tech experts into the general public consciousness.

8.  In order to transact in cryptocurrency, you must have a "wallet".  Like a bank account number, each wallet has a "public key" that is the "address" provided if one would like to receive cryptocurrency.  Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet. Wallets are separate computer files dedicated to storing information about specific bitcoins.

9.  Each wallet is also assigned a "private key."  Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet. The private key is like the "password" to the wallet. To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet. This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

10. There are two methods of acquiring bitcoins. The first involves simply exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from individuals looking to sell.

11. The second way one can acquire bitcoins is by "mining" them as referenced above. There is no centralized authority that curates the Bitcoin blockchain.  Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place.  This process is called "bitcoin mining."

12. Cryptocurrency mining is one of the most commonly used methods of validating transactions that have been executed over a blockchain network. Not only does blockchain work to protect transaction data through encryption, as well as store this data in a decentralized manner (i.e., on hard drives and servers all over the world) so as to

keep a single entity from gaining control of a network, but also the primary goal is to ensure that the same crypto token isn't spent twice. In effect, "mining" is one means of making sure that cryptocurrency transactions are accurate and true, such that they can never be compromised in the future.

13.   Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoins (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

14.   When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions added to the blockchain ledger. The protocol cuts this mining reward in half every four years so that the maximum amount of bitcoin in existence will never exceed 21 million.

15.   To date, just over 17 million of the total 21 million bitcoins have been mined.

## History of Bitcoin

16.   On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

17.   Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a

text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

18.   Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

19.   Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the Bitcoin protocol until mid-2010. Around this time, he handed control of the Bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent on April 23, 2011. It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

20.   For most of its early history, bitcoins were of relatively little value. Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoins to purchase two Domino's pizzas on May 22, 2010. At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

21.   During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoins." Thus, individuals mining bitcoins through 2013 could expend relatively minor resources to accumulate large sums of bitcoins.

22.   It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.  As the cryptocurrency wave began to propagate from a small

segment of computer science gurus, into the media, and then to consumers at large, tech-savvy entrepreneurs saw an opportunity.

**History of Litecoin**

23.     Currently, Litecoin is in the top 10 of over 1,000 cryptocurrencies listed on coinmarketcap.com.  It was created by a former Google employee named Charlie Lee. He initially got involved in the cryptoscene by attempting to revive a coin called Fairbrix. Unfortunately, it was a failure because of a bug that stopped Fairbrix blocks from producing coins as well as a 51% attack from the moment of its re-release. However, Charlie did not give up. Instead, he pressed on by looking at the source code for Bitcoin and then making a few adjustments he thought were necessary. Finally on October 7, 2011, Charlie released an open-source client on github called "Litecoin."

24.     Currently, Litecoin has certain advantages over Bitcoin:

  a.   Speed- Litecoin is confirmed faster than Bitcoin because it generates a block every 2.5 minutes as opposed to Bitcoin's 10 minutes. This means you get your money quicker.

  b.   Liquidity- Litecoin will produce a total of 84 million coins as opposed to Bitcoin's 21 million. This means that it will be more readily available for daily purchases instead of being hoarded like Bitcoin.

  c.   Equality- Litecoin miners use a slightly different mining protocol which creates a fairer distribution of coins.

  d.   Technology- Litecoin is capable of testing and implementing technology faster than Bitcoin. For example, Litecoin pioneered the way for the technology called Segregated Witness by implementing it three months before Bitcoin.

This technology is significant because it allows both Bitcoin and Litecoin to scale by making them faster and creates lower transaction fees.

### History of Coinbase

25. Coinbase.com is owned and operated by San Francisco-based Coinbase, Inc., a privately held company that allows consumers to buy and sell cryptocurrencies using an intuitive, user-friendly online interface. Coinbase is a money services transmitter licensed to transmit money in the us and registered with FinCEN.

26. Coinbase has two core products: (1) a Global Digital Asset Exchange (GDAX) for trading a variety of digital assets on its professional asset trading platform, and (2) a user-facing retail broker of Bitcoin, Bitcoin Cash, Ether, Litecoin for fiat currency. It also offers an application programming interface for developers and merchants to build applications and accept payments in both digital currencies. As of 2018, the company offered buy/sell trading functionality in 32 countries, while the cryptocurrency wallet was available in 190 countries worldwide.

27. For the last several years, Coinbase has allowed consumers to purchase cryptocurrencies online using their personal credit cards. Throughout these years, Defendants BOA and VISA along with other major banks, likewise permitted their credit card customers to purchase cryptocurrencies online. Whenever BOA's credit cardholders did so, however, BOA processed their crypto purchases from Coinbase and other merchants as "Foreign Transactions."

28. BOA provided no notice to its cardholders that their crypto "Purchases" would be treated as "Foreign Transactions." All of this was occurring unbeknownst to BOA's cardholders. Defendants BOA and VISA split the "Foreign Transaction fee".

29.     Plaintiff and other Class members had been using their credit cards to buy cryptocurrencies, not because they needed to borrow money in the first place, but instead because it was the only way to acquire cryptocurrencies *instantly* via Coinbase and other merchants.

30.     Purchasing cryptocurrencies with a bank account number would typically require several days of processing time. Consequently, consumers had long been using their credit cards to purchase cryptocurrencies simply to avoid unnecessary delays in delivery. As a result, Plaintiff and the Class continually made routine crypto purchases via Coinbase and other merchants using their BOA credit cards.

31.     Unbeknownst to Class members, however, they were engaging in "Foreign Transactions" according to BOA and VISA, which included fees for each transaction. Plaintiff and the Class had been duped. BOA silently smacked them with instant foreign transaction fees and left them without any recourse.

32.     Before Coinbase discontinued accepting credit cards as a form of payment in February 2018, both BOA and VISA collected a portion from each "foreign transaction" that was made with a BOA credit card. BOA charged Plaintiff and the proposed Class Members 3% on all supposed foreign transactions; with 2% being retained by BOA and 1% being collected by VISA.

33.     VISA is a membership corporation; created, owned, and governed by its member financial institutions, including BOA. VISA and BOA are a joint venture, formed for the purpose of disseminating, encouraging, and profiting from the use of VISA branded credit cards. VISA, within the scope of its joint venture with BOA, acts on behalf of BOA and BOA acts on behalf of VISA, to further the joint ventures.

34.    In sum, the complete lack of disclosure and mischaracterization of the transactions to Defendants' cardholders caused them to unknowingly incur millions of dollars in "foreign transaction" fees on each and every crypto purchase.

35.    Defendant BOA's silent and improper charges violates the Federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), which aims to promote the informed use of consumer credit by requiring disclosures about its terms and cost. Defendant VISA's actions also violate Fla. Stat. §501.204 ("FDUTPA"), and both BOA and VISA's actions violate N.C. Gen. Stat. §75-1.1 ("UDTPA"), which both ban unfair or deceptive acts or practices in the conduct of any trade or commerce. Further, BOA's and VISA's actions unjustly enriched both BOA and VISA. Had BOA notified its cardholders, as required by law, that these "foreign transaction" fees would be applied to cryptocurrency purchases, Plaintiff and the Class would not have incurred millions of dollars in foreign transaction fees. Plaintiff and the Class seek, *inter alia*, a complete refund of all mischaracterized "foreign transaction" related charges levied against them by Defendants in connection with their recent cryptocurrency purchases.

## JURISDICTION AND VENUE

36.    Plaintiff is a resident of Miami-Dade County, Florida and is otherwise sui juris.

37.    Defendants BOA and VISA are citizens of the state of Delaware but also conduct business in the Southern District of Florida and are otherwise sui juris.

38.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states.  The matter in controversy exceeds $75,000.

39.    Alternatively, jurisdiction is proper as the amount in controversy exceeds $5,000,000 exclusive of interest and costs as there are likely thousands harmed by Defendants'

conduct in a substantially similar way.  Jurisdiction is also appropriate pursuant to 28 U.S.C. §1332(d)(2).

40.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district.  These events include, but are not limited to, the charging of foreign transaction fees to Plaintiff's credit card which were placed on his statement and mailed to him in Miami-Dade County, Florida.

## SUBSTANTIVE ALLEGATIONS OF CLASS REPRESENTATIVE

41.   Plaintiff, Reuven Herssein, is a resident of Miami-Dade County, Florida.

42.   Plaintiff is a cardholder with BOA and VISA for an account ending in 7812.

43.   On December 4, 2017, Plaintiff used his BOA/VISA credit card to purchase $400.00 worth of Litecoin through Coinbase. Again, on December 10, 2017, Plaintiff used his BOA/VISA credit card to purchase another $330.00 worth of Litecoin through Coinbase. Coinbase money services transmitter is licensed to transmit money in the U.S. and is registered with FinCEN.

44.   On December 5, 2017, Plaintiff was charged a "foreign transaction fee" for his December 4, 2017 Litecoin transaction. On December 11, 2017, Plaintiff was charged a foreign transaction fee for his December 10, 2017 Litecoin transaction.

45.   Plaintiff's cardholder agreement defines "foreign transaction fees" as follows:

**FOREIGN TRANSACTIONS**

**A "Foreign Transaction" is any transaction (1) made in a foreign currency, or (2) made in U.S. dollars if the transaction is made or processed outside of the United States. Foreign Transactions include, for example, online transactions made in the U.S. but with a merchant who processes the transaction in a foreign country. If you make a Foreign Transaction, we will**

**assess the Foreign Transaction Fee set forth in the Transaction Fees section of this Agreement. If a transaction is made in a foreign currency, the transaction will be converted by Visa International or Mastercard International, depending on which card is associated with this account, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.**

46.    The purchase by Plaintiff was made with U.S. Dollars inside the United States. Moreover, Litecoin is not a foreign currency and no purchase was made in a foreign currency or in a foreign country.

47.    Therefore, Plaintiff has been charged a foreign transaction fee for a non-foreign transaction as defined by the card-holder agreement and has been damaged.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities in the United States who, as cardholders with BOA and VISA, upon purchasing a cryptocurrency from Coinbase.com or another online crypto merchant, incurred "foreign transaction" fees on credit cards issued by Bank of America, N.A. and VISA USA, Inc. Excluded from the Class are BOA and VISA, the officers and directors of BOA and VISA, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which BOA or VISA has or had a controlling interest.

49. **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable. Hundreds, if not thousands, of BOA credit card members used their BOA cards to purchase cryptocurrencies from Coinbase.com and other online crypto merchants for millions of dollars, collectively. While the exact number of Class members is unknown to Plaintiff at this time, and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified and located from records maintained by BOA and/or VISA and may be notified of the pendency of this action by electronic mail and/or regular mail, using the form of notice similar to that customarily used in class actions.

50. **Typicality**: Plaintiff's claims are typical of Class members' claims, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law as complained of herein.

51. **Adequacy of Representation**: Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52. **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. Whether Defendant BOA violated TILA by failing to comply with the notice requirements related to transactions and improperly categorizing cryptocurrency purchases as "foreign transactions":

b.   whether Defendant VISA, in fact, violated FDUTPA by engaging in deceptive and unfair trade practices or actions;

c.   whether Defendants, in fact, violated North Carolina's UDTPA by engaging in unfair and deceptive trade practices or actions;

d.   whether Defendants were unjustly enriched by their wrongful conduct;

e.   whether Plaintiff and the Class suffered damages as a result of Defendants' conduct, and the proper measure of such damages; and

f.   whether Plaintiff and the Class are entitled to actual and statutory damages, as well as reasonable attorneys' fees and expenses as a result of Defendants' wrongful conduct.

53.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would make it difficult if not impossible for members of the Class to redress the wrongs done to them on an individual basis. There will be no difficulty in the management of this case as a class action.

## COUNT I – VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. §§ 501.201 – 501.213) ("FDUTPA") AGAINST VISA

54.   Plaintiff repeats and realleges paragraphs 1 to 53 set forth above as if fully set forth herein.

55.   Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act is to be liberally construed to protect the consuming public, such as Plaintiff in this case, from

those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

56.     Plaintiff and proposed Class Members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

57.     VISA engaged in trade and commerce within the meaning of Fla. Stat. § 501.203(8).

58.     While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms. The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

59.     VISA failed to inform Plaintiff and the proposed Class Members that their crypto purchases would be treated as "foreign transactions" and incur fees for each transaction. VISA also incorrectly characterized Plaintiff's and proposed Class Members' transactions as "foreign."

60.     Further, under Florida law, virtual currency is defined as "a medium of exchange in electronic or digital format that is not a coin or currency of the United States or any other country." H.B. 1379, 119th Reg. Sess. (Fla. 2017). The fact that virtual currency is not considered to be currency of any other country prevents and VISA from characterizing the transactions as "foreign."

61.     As a result of the false representations and mischaracterizations described above, Plaintiff and the potential Class Members have been damaged by losing millions of collective dollars through the improper "foreign transaction" fees.

62.     Therefore, VISA engaged in unfair and deceptive trade practices in violation of §
        501.201 *et seq.*, Fla. Stat.

63.     Plaintiff has retained the undersigned firms to represent it in this action and has agreed to
        pay a reasonable fee for said services.

64.     Pursuant to §§ 501.211(1) and 501.2105, Fla. Stat., Plaintiff and the proposed Class
        Members are entitled to recover from and VISA the reasonable amount of attorneys' fees
        Plaintiff and the proposed Class Members have incurred in representing their interests in
        this matter.

        WHEREFORE, Plaintiff demands a declaratory judgment against Defendant VISA
declaring its conduct as violative of §501.204, Fla. Stat., and further to enjoin VISA from its
violative conduct pursuant to pursuant to §501.211, Fla. Stat. and for damages, interest, court
costs, attorneys' fees pursuant to § 501.2105, Florida Statutes, and any other relief this Court
deems just and proper.

### COUNT II – VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. § 75-1.1) (UDTPA) AGAINST BOA AND VISA

65.     Plaintiff repeats and realleges paragraphs 1 through 53 set forth above as if fully set forth
        herein.

66.     Chapter 75-1.1, N.C. Gen. Stat., North Carolina's Unfair and Deceptive Trade Practices
        Act, has been applied liberally among the North Carolina courts, as its primary purpose
        was to create a private cause of action for aggrieved consumers.

67.     BOA and VISA engaged in "commerce" pursuant to N.C. Gen. Stat. § 75-1.1 as the
        statute only requires the Defendant's actions to have been "in or affecting commerce."

Plaintiff and the proposed Class Members engaged in commerce with Defendants by using credit cards issues by Defendants.

68.  "Unfair or deceptive acts" in the statute, but practices have been found to be unfair when it offends established public policy or when the act or practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." For an act or practice to be deceptive, it must have "the capacity or tendency to deceive" but proof of actual deception is not required.

69.  BOA and VISA failed to inform Plaintiff and the proposed Class Members that their crypto purchases would be treated as "foreign transactions" and incur fees for each transaction which is per se deceptive and unfair.

70.  BOA and VISA also incorrectly characterized Plaintiff's and proposed Class Members' transactions as "foreign," as BOA's own informational documents define "Foreign Transactions" as "any transaction (1) made in a foreign currency, or (2) made in U.S. dollars if the transaction is processed outside of the United States." Plaintiff's and the proposed Class Members' transactions were neither made in a foreign currency nor processed outside the United States.

71.  Further, under North Carolina law, virtual currency is defined as "a digital representation of value that can be digitally traded and functions as a medium of exchange, a unit of account, or a store of value but only to the extent defined as stored value … but does not have legal tender status as recognized by the United States Government." (2016-81, s. 1; 2017-102, ss. 14.1(a), 46.) The fact that virtual currency is not considered to have legal tender status of any country, including the United States, prevents BOA and VISA from characterizing the transactions as "foreign."

72.     As a result of the false representations and mischaracterizations described above, Plaintiff and the potential Class Members have been damaged by losing millions of collective dollars through the improper "foreign transaction" fees.

73.     Therefore, BOA and VISA engaged in unfair and deceptive trade practices in violation of § 75-1.1 *et seq.*, N.C. Gen. Stat.

74.     Plaintiff has retained the undersigned firms to represent it in this action and has agreed to pay a reasonable fee for said services.

75.     Pursuant to § 75-16.1, N.C. Gen. Stat., Plaintiff and the proposed Class Members are entitled to recover from BOA and VISA the reasonable amount of attorneys' fees Plaintiff and the proposed Class Members have incurred in representing their interests in this matter.

76.     Pursuant to § 75-16, N.C. Gen. Stat., if a violation under this section is found, Plaintiffs are entitled to treble damages. Trebling of damages is automatic once a violation is shown because the award of trebled damages is a right of the prevailing Plaintiff and is not subject to judicial review.

WHEREFORE, Plaintiff demands judgment against Defendants BOA and VISA for damages, interest, court costs, attorneys' fees pursuant to § 75-16.1, N.C. Gen. Stat., treble damages pursuant to § 75-16, N.C. Gen. Stat., and any other relief this Court deems just and proper.

## COUNT III – UNJUST ENRICHMENT AGAINST BOA AND VISA

77.   Plaintiff repeats and realleges paragraphs 1 through 54 set forth above as if fully set forth herein.

78.   Plaintiff and the proposed Class Members conferred a benefit upon BOA and VISA by unknowingly paying improper fees for "foreign transaction" fees for transactions that were not considered foreign, even under Defendants' own terms.  VISA collected a third of every single "foreign transaction" fee.

79.   Through Defendants' unfair, misleading, and unlawful conduct alleged herein, BOA and VISA have unjustly received and retained benefits at the expense of Plaintiff and the proposed Class Members.

80.   Under principles of equity and good conscience, BOA and VISA should not be permitted to retain valuable funds belonging to Plaintiff and the proposed Class Members that they unjustly received as a result of Defendants' unfair, misleading, and unlawful conduct alleged herein without providing compensation to Plaintiff and the proposed Class Members.

81.   Plaintiff and the proposed Class Members have suffered financial loss as a direct and proximate result of Defendants' conduct.

82.   Plaintiff and the proposed Class Members are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by VISA and for such other relief that this Court deems proper, as a result of Defendants' unfair, misleading, and unlawful conduct.

83.   Plaintiff has retained the undersigned firm to represent it in this action and has agreed to pay a reasonable fee for said services.

WHEREFORE, Plaintiff demands judgment against BOA and VISA awarding Plaintiff and the proposed Class Members restitution, including, without limitation, disgorgement of all profits and unjust enrichment that VISA obtained as a result of their unlawful and unfair business practices and conduct, as well as any other relief this Court deems just and proper.

**COUNT IV – BREACH OF CONTRACT**
**BREACH OF IMPLIED WARRANTY OF GOOD FAITH AND FAIR DEALING**
**AGAINST BOA**

84.    Plaintiff repeats and realleges paragraphs 1 through 54 set forth above as if fully set forth herein.

85.    In order to benefit from using Defendants' jointly issued credit cards, Plaintiff and the proposed Class Members affirmatively assented to the provisions in the cardholder agreement between themselves and Defendant BOA.

86.    The cardholder agreement constitutes a valid and enforceable contract between Plaintiff and the proposed Class Members and Defendant BOA.

87.    Pursuant to the terms of the cardholder agreement, BOA are not authorized to charge foreign transaction fees outside of the stated provisions of the cardholder agreement.

88.    The specific provision of the cardholder agreement identifying what would be considered for a foreign transaction states as follows:

> **FOREIGN TRANSACTIONS**
>
> **A "Foreign Transaction" is any transaction (1) made in a foreign currency, or (2) made in U.S. dollars if the transaction is made or processed outside of the United States. Foreign Transactions include, for example, online transactions made in the U.S. but with a merchant who processes the transaction in a foreign country. If you make a Foreign Transaction, we will assess the Foreign Transaction Fee set forth in the Transaction Fees section of this Agreement.**

89.    Florida recognizes the implied covenant of good faith and fair dealing in every contract.

90.   In addition to the cardholder agreement between Plaintiff and BOA, there exists an implied warranty of good faith and fair dealing contained as a material term in the contract which prevents BOA from engaging in conduct that frustrates or injures Plaintiff's and the proposed Class Members' rights to receive the benefits of the cardholder agreement.

91.   Plaintiff and the proposed Class Members and Defendant BOA entered into a valid contract in which Plaintiff and the proposed Class Members did all of the significant things that the cardholder agreement required of them.

92.   All conditions required for Defendant BOA's performance had occurred and their actions unfairly interfered with Plaintiff's and the proposed Class Members' receipt of the contract's benefits.

93.   Defendant BOA's conduct did not comport with Plaintiff's and the proposed Class Members' reasonable contractual expectations under a specific provision of the contract and as a result, Plaintiff and the proposed Class Members were harmed.

94.   BOA materially breached its implied warranty of good faith and fair dealing by, among other things:

   a.   charging "foreign transaction" fees when no foreign currency was used and no transaction was processed outside the United States; and

   b.   failing to disclose to Plaintiff and the proposed Class Members of the method for determining any fees related to non-foreign transactions for cryptocurrency purchases.

95.   As a direct and proximate result of BOA's breach of the implied warranty of good faith and fair dealing, Plaintiff and the proposed Class Members have suffered damages.

WHEREFORE, Plaintiff and the proposed Class Members demand judgment against BOA for damages, including nominal damages, and any other such relief as this Court deems just, equitable, and proper, and demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and the law firm of Beighley, Myrick, Udell, & Lynne, P.A. as Class Counsel;

B.      Requiring Defendants VISA and BOA to pay the actual damages sustained by Plaintiff and the proposed Class Members by reason of the acts and transactions alleged herein, as well as treble damages for the claim pursuant to N.C. Gen. Stat. § 75-1.1 and award attorney's fees and costs under N.C. Gen. Stat. § 75-16.1

C.      Requiring Defendant VISA to pay Plaintiff's actual damages as a result of violation of §501.204, Fla. Stat. and to pursuant to pursuant to §501.211, Fla. Stat. to declare VISA's conduct as violating Fla. Stat. §501.204 and further to enjoin VISA from its conduct pursuant to pursuant to §501.211, Fla. Stat. and award Plaintiff his attorney's fees and costs pursuant to §501.2105;

D.      A judgment awarding Plaintiff and the proposed Class Members restitution, including, without limitation, nominal damages, compensatory damages, disgorgement of all profits and unjust enrichment that Defendants BOA and VISA obtained as a result of its unlawful and unfair business practices and conduct;

E.      Awarding Plaintiff and other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs and expenses of this litigation; and

F.      Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Please take notice that Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable as of right by jury.


Dated: August 17, 2018                          Respectfully Submitted,

                                                Beighley, Myrick, Udell & Lynne, PA

                                                Attorneys for Plaintiff
                                                150 West Flagler Street
                                                Suite 1800
                                                Miami, FL 33130
                                                (305) 349-3930 – Phone
                                                mudell@bmulaw.com

                                        By:     */s/ Maury L. Udell*_____
                                                Maury L. Udell, Esq.
                                                Fla. Bar 121673